(160 App. Div. 268)

### BISSELL v. MYTON et al.

(Supreme Court, Appellate Division, First Department. January 23, 1914.)

1. APPEAL AND ERROR (§ 267*)—REVIEW—REVIEW OF FACTS.

On an appeal to the Appellate Division from a judgment entered upon a decision of the Trial Term to which no exceptions were filed, the Appellate Division may review the facts under Code Civ. Proc. § 993.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1447, 1460, 1572–1578, 1581; Dec. Dig. § 267.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. BASTARDS (§ 16*)—LIABILITIES TO SUPPORT.

At common law the putative father of an illegitimate child is under no legal obligation to support it.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 21–23; Dec. Dig. § 16.*]

3. BASTARDS (§ 16*)—IMPLIED CONTRACTS.

Where a putative father of illegitimate children executed an agreement with the natural mother terminating all relations between them and reciting that he did not admit the children were his and that for a certain sum she would save him harmless from any claim for their support, the putative father could not thereafter be held liable on an implied contract for medical services to the children.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 21–23; Dec. Dig. § 16.*]

4. BASTARDS (§ 16*)—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action for medical services rendered the children of which defendant was the putative father, evidence held not to show an express contract by defendant to pay for such services.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 21–23; Dec. Dig. § 16.*]

5. EVIDENCE (§ 185*)—SECONDARY EVIDENCE.

Upon a party's failure to produce books in his possession containing relevant evidence after receiving notice to produce them, the other party may give secondary evidence of the documents called for by the notice.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 642–660; Dec. Dig. § 185.*]

Appeal from Trial Term, New York County.

Action by Joseph B. Bissell against Mary P. Myton and another, as executor of the will of Alfred Sully, deceased. From a judgment for plaintiff, defendants appeal. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Frank T. Wells, of Amityville (Rowland Miles, of Northport, of counsel), for appellants.

Franklin Bien, of New York City, for respondent.

CLARKE, J. This is an action brought by a physician against the executor and executrix of the estate of Alfred Sully for medical services alleged to have been rendered between October 12, 1900, and March 12, 1909, to three minor children, alleged to be the children of said Sully, born out of wedlock. The action was at law, and, coming on for trial at the Trial Term, a jury was waived. Decision was reserved at the close of the taking of testimony, and subsequently a decision containing findings of fact and conclusions of law was made and filed by the trial judge upon which the judgment appealed from was entered.

[1] No exceptions were filed to said decision. Respondent contends, as his first point, that an appeal from a judgment entered upon a decision, to which decision no exceptions had been filed, brings up for review only the rulings to which exceptions were taken on the trial, and therefore that the facts cannot be reviewed by this court.

In Henderson v. Dougherty, 95 App. Div. 346, 88 N. Y. Supp. 665, Mr. Justice Ingraham said:

"It is claimed by the plaintiffs that this exception is insufficient to justify this court in determining any question of fact on this appeal, but under the existing provisions of the Code of Civil Procedure it does not appear that an exception is necessary to enable this court to review a question of fact presented upon an appeal from a judgment entered upon the report of a referee or the decision of the court without a jury.

"Section 992 of the Code of Civil Procedure provides that, except as prescribed in section 1180, an exception cannot be taken to a ruling upon a question of fact. Section 993 provides that the Appellate Division of the Supreme Court shall, on appeal from a judgment entered on the report of a referee, or the decision of a court on such trial, review all questions of fact and of law, and may either modify or affirm the judgment or order appealed from, award a new trial, or grant to either party the judgment which the facts warrant. Section 994 provides the method for taking an exception to a ruling upon a question of law upon a trial of an issue of fact before a referee, or by the court without a jury. Under the provisions of these sections it would appear that upon an appeal from a judgment entered upon the report of a referee or the decision of the court, the facts are before the Appellate Division, and no exception to the report or decision is necessary to require a review of the questions of fact presented. The power to review a judgment by this court, and by the Court of Appeals, is essentially distinct. The jurisdiction of the Court of Appeals is restricted to questions of law (Const. art. 6, § 9; Code Civ. Proc. § 191, subd. 3), and that court has uniformly held that it can only review a decision to which a valid exception has been taken, as it is expressly provided that an exception cannot be taken to a ruling upon a question of fact, and that upon an appeal from a judgment the Appellate Division shall review all questions of fact, and that no exception to the report or decision is necessary."

And in Witte v. Koerner, 123 App. Div. 824, 108 N. Y. Supp. 560, Mr. Justice Miller, writing for the Appellate Division of the Second Department, said:

"The respondent asserts that we cannot review the facts for the reason that no exceptions to the findings of fact were filed. An exception is only necessary to raise a question of law; indeed, it would seem that an exception can only be taken to a ruling on a question of law, a finding of fact without any evidence tending to sustain it being deemed such. Code Civ. Proc. §§ 992, 993, 994. This court is required to review the facts. Code Civ. Proc. § 993; Henderson v. Dougherty, 95 App. Div. 346 [88 N. Y. Supp. 665]."

In Carroll v. Bullock, 207 N. Y. 567, 101 N. E. 438, Miller, J., writing the unanimous opinion of the Court of Appeals, said:

"A finding of fact without any evidence tending to sustain it is a ruling upon a question of law, and an exception is necessary to review it in this court; but the Appellate Division is required, as that court in the first and second department has decided, to review the facts on an appeal from a judgment entered on the report of a referee, or the decision of the court on a trial by the court without a jury, even in the absence of an exception (citing Code Civ. Proc. § 993, and the two cases, supra). * * * It follows that the Appellate Division had the power to review the facts, and, there being a question of fact in the case, we must either dismiss the appeal or affirm the judgment and grant judgment absolute on the stipulation."

The point seems settled against the contention of the respondent, and we proceed to examine the facts.

The plaintiff testified that he knew Alfred Sully in his lifetime very

well; that during his lifetime he rendered medical services to members of his family, Reginald Sully, Cecelia Sully, and Catherine Sully.

"I saw these children at various places in the city; sometimes in my office, frequently in my office. They were living with Mrs. Brown. She was their mother. I was never paid for the services by any of these children. I was never paid by the mother for any services."

It does not appear that any bill was presented to Mr. Sully in his lifetime. He died in May, 1909, and the verified claim herein was not presented until January 27, 1911. A witness was sworn under the name of Catherine Brown, who testified that she certainly knew Alfred Sully in his lifetime; that she met him in the year 1888 and knew him up to the time of his death; that she lived with him for four years; that she had started a suit against the estate on a written contract.

"He agreed to give me $3,000 a year as long as I lived. My name was formerly Catherine Bowley. I have been married since that time, but he agreed to give me this money for life. Subsequently my name became Brown by marriage. My last marriage occurred in 1904. I lived with Mr. Sully from 1888 to 1892. * * * My husband, Mr. Brown, died in June, 1907. These children who were born to me between 1888 and 1892 resided with my husband and myself at times, but they were generally at school. * * * My home after my marriage with Mr. Brown was all the home they had excepting when they were away at school; they were part of my household during my marriage with Mr. Brown. * * * Mr. Brown died in 1907. Mr. Sully died, I think, May 27, 1909. I was not divorced from Mr. Sully because I was his common-law wife. I was not the wife of two men at the same time. I was not the common-law wife of Sully and the legal wife of Brown at the same time. Between the years 1888 and 1892 I was the common-law wife of Alfred Sully. * * * This common-law marriage that I claim was dissolved in this way. We parted in the year 1893. It was not dissolved by the courts. It did not go to court. It was settled out of court. I signed some paper. * * * He settled it. * * * He paid me up to the time of his death and all through my marriage with Brown, from 1893 to 1909, he paid me $3,000 a year. My children go under the name of Sully. They took it themselves. * * * You see Mr. Sully and I lived together as husband and wife under the name of Mr. and Mrs. John Belden. * * * During my marriage to Mr. Brown they were known under the name of Belden. These children were born between the years 1888 and 1892.

"Q. Who was the father of these children? (This was objected to and admitted under exception.)

"The Court: You make a motion to strike out later, and I will reserve decision. A. Alfred Sully.

"Q. Who supported these three children? (Objection overruled. Exception.) A. Mr. Sully.

"Q. From what time until what time? A. From the time I left him in 1893 until the time of his death. Mr. Sully supported them prior to that time from the time of their birth.

"Q. Had Dr. Bissell prior to the death of Mr. Sully attended these children prior to the time mentioned in the bill for which he is now suing? (Objection overruled. Exception.) A. Yes. I do not know who paid for that."

She said she was present at a conversation between Dr. Bissell and Mr. Sully in reference to the payment of his bill in about 1892. "I just remember that Mr. Sully said that he would pay the doctor's bill, that is all. * * * He said he would always pay the bills.

"Q. Coming down to the year 1907, did you have any conversation with Mr. Sully in relation to plaintiff's bill? A. Yes. * * * I think I was living at the Brevoort Hotel. * * * Dr. Bissell was anxious about his money. I don't know what he said. He said he would pay the doctor. The doctor wanted his money. He said he would pay it as soon as he could."

Under cross-examination she testified:

"My present name is Brown-Travers. How long I have been going under this name has no bearing on the case. I have been going under the name of Travers about 2½ years. I will not answer whether or not I am married to some one by the name of Travers. * * * I am not married to some one by the name of Travers. I changed my name from Brown to Travers for reasons. * * * I was known as Mrs. Watress from the year 1899 until 1903. I was married to a Mr. Flecker. I was married to him about a year and eight months. I think I was married in 1897. I do not remember. * * * I got a divorce from him. I was married to a Mr. Ballou * * * in 1896. He lived one year; that is all. I married Mr. Brown, I think it was in August, 1904."

The contract was put in evidence. It recites:

"Whereas, Alfred Sully and Catherine S. Bowley, have cohabited together at various times during the past five years, and whereas, the relations of said Alfred Sully and Catherine S. Bowley have been purely meretricious, there having been no marriage or contract or promise of marriage between said parties, and whereas, the said Alfred Sully does not admit that the children of said Catherine S. Bowley are of his body, and whereas, the said Alfred Sully and Catherine S. Bowley have mutually agreed to end and determine the relations existing between them. * * * "

She agreed to deliver up all letters or communications whatsoever, photographs and papers that had passed between the parties; that she would not print or allow to be printed or written any letters or statement or accusations against him; that she will not use or allow to be used his name in connection with herself or with her children; that she will defend and save him harmless from any claim or demand whatsoever for the support or maintenance of her children. He agreed for himself and his executors and administrators to pay to her during her natural life, or until she shall have broken or failed to fulfill the agreement, $3,000 per annum.

Upon this evidence the learned court has found that between the 1st of September, 1900, and the 16th of May, 1908, the plaintiff rendered medical services to various members of the family of Alfred Sully, now deceased, at his instance and request, and which services were of the reasonable value of $588, which said Alfred Sully agreed to pay, but no part of which has been paid; and as a conclusion of law that the plaintiff is entitled to judgment.

[2] At common law the putative father of an illegitimate child is under no legal obligation to support his offspring. In Moncrief v. Ely, 19 Wend. 406, Nelson, J., said:

"But it cannot be a matter of doubt that anterior to the statutes of 18 Eliz. and 6 Geo. II, the putative father was under no legal liability to maintain his illegitimate offspring, and as that liability has been wholly created by statute, the remedy there prescribed to enforce the duty must be followed. We have copied these statutes and others on the same subject, and they afford ample provision both for the public, and all individuals concerned. * * * Where he admits himself the father, and adopts the child, while such adoption continues, a promise may be implied in favor of the party providing for it; but he may renounce the adoption, and terminate the implied assumpsit, and then the statute remedy may be pursued"—cited with approval, Todd v. Weber et al., 95 N. Y. 181, 47 Am. Rep. 20.

[3] If the claim had been for services rendered during the four years in which Sully and Mrs. Brown lived together, an obligation

resting upon an implied promise, based upon the parent's recognition and adoption of the children, might have been sustained. But that situation was terminated on the 18th day of November, 1893, by the written agreement wherein Sully did not admit that the children were his; where she agreed that she would defend and save him harmless from any claim or demand whatsoever for the support or maintenance of her children, and wherein he agreed to give her $3,000 a year, which terms he kept down to the day of his death.

According to her own testimony, she thereafter married three other men, and she says that her home was the children's home. These facts are absolutely destructive of any obligation based upon an implied promise.

The judgment must depend for its validity upon the finding of an express promise. The sole basis in the evidence for this is the testimony of the mother of a conversation had at the Brevoort Hotel in 1907, in which she says Dr. Bissell was anxious about his money:

"I don't know what he said. He (referring to Mr. Sully) said he would pay the doctor, said he would pay it as soon as he could."

[4] I am of the opinion that, in the face of the documentary evidence and the other facts proved, the finding of an express promise, based upon her evidence, in the face of the written agreement, is against the weight of evidence.

I am supported in this view because the learned trial court found sufficient corroboration, as expressed in his opinion, from "defendants' neglect or refusal to account for their failure to produce, after due and timely notice, certain books, checks, and other writings of their testator which might have shown that plaintiff and defendants' testator had previous dealings in reference to services rendered of the same nature, which tends to make for corroboration on the part of the plaintiff. These facts, with their necessary and probable inferences, convince me that there was a valid and subsisting contract between plaintiff and defendants' testator."

[5] The effect of failure to respond to the notice to produce is to permit the parties serving the notice to give secondary evidence of the documents called for. It is a novel proposition that, without a particle of evidence as to the existence of such documents, or an attempt to establish their contents in the usual way of secondary evidence, the judicial inference can be drawn: First, that such documents existed; and, second, that failure to produce them proves the plaintiff's case.

In Jones v. Reilly, 174 N. Y. 97, 66 N. E. 649, the Court of Appeals reversed the unanimous decision of the Appellate Division, Cullen, J., writing, who said:

"The plaintiffs served upon the defendants a subpœna requiring the production of a number of receipts for rent. This subpœna with proof of its service was, against the objection and exception of the defendants, read in evidence. No testimony was given to show that there had been any such receipts, and no attempt was made to prove their contents. If the plaintiff's intention was to offer secondary evidence on the subject, it doubtless would be proper to file the subpœna with the court and prove its service. It is contended by the respondent that such was their only purpose in offer-

ing the subpœna. If we were permitted to speculate on the subject, we might think that probably such was the object of the counsel.° But the record shows that it was read in evidence and the effect on the jury of the recital of such a number of receipts, the existence of none of which was actually proved, might well have been prejudicial to the defendants."

The judgment appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.